Filed 7/27/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re X.A. et al., | B350895 |
| Persons Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. 22CCJP00758) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. SARAH M., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Davis, Judge. Affirmed.

Aida Aslanian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Jacklyn K. Louie, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

---

Appellant Sarah M. (Mother) challenges for a second time the juvenile court's order under Welfare and Institutions Code[1] section 366.26 terminating her parental rights to minors X.A. (born 2019) and E.A. (born 2021). In a prior appeal, we affirmed the juvenile court's finding that the beneficial relationship exception to termination of Mother's parental rights was inapplicable. (*In re X.A.* (Jan. 31, 2025, B338604) [nonpub. opn.].) But we conditionally reversed the parental rights termination order because the Los Angeles County Department of Children and Family Services (DCFS) and a child welfare agency in another county where the dependency case originated failed to adequately inquire whether the children were "Indian children" as defined in the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and related California law (Cal-ICWA; § 224 et seq.). (*In re X.A., supra,* B338604.)

Following remand, DCFS conducted extensive ICWA inquiry. The juvenile court found no reason to believe the minors were Indian children and reinstated the parental rights termination order. Mother now appeals again. We reject her claims that the ICWA-related inquiry is still inadequate and affirm the order terminating Mother's parental rights.

---

[1] Unspecified statutory references are to the Welfare and Institutions Code.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother's current challenge to the adequacy of ICWA-related inquiry concerns only her blood relatives and not Father or his ancestry. We thus confine our summary of the factual and procedural background to the inquiry of maternal relatives.

### A.      Initial Inquiry and First Appeal

On October 29, 2021, the Kern County Department of Human Services (KCDHS) filed a section 300 petition on behalf of X.A. and E.A. asserting claims under section 300, subdivision (b). Mother filed a document with the Kern County juvenile court disclaiming any Native American heritage, and at the detention hearing the court found no reason to believe the children were Indian children. The record does not disclose any efforts by KCDHS or the Kern County juvenile court beyond the receipt of this form from Mother to inquire of maternal relatives whether the children might be Indian children.

The Kern County court later ordered the case transferred to Los Angeles County, and on March 9, 2022, the Los Angeles County juvenile court accepted the transfer. DCFS repeatedly asked Mother whether she had any Native American heritage, and Mother denied any such heritage, but nothing in the record indicates that DCFS or the juvenile court made the same inquiry of any extended family members. (*In re X.A.*, *supra*, B338604.)

Mother appealed following the termination of her parental rights, contending KCDHS and DCFS failed to comply with their duty of inquiry under ICWA and Cal-ICWA because they relied entirely on the denials by Mother regarding possible tribal affiliation. DCFS conceded this error, and we conditionally reversed the order terminating parental rights pending DCFS's

3

and the juvenile court's compliance with ICWA and related state law. (*In re X.A.*, *supra*, B338604.)

## B. Inquiry Following the First Appeal of Maternal Relatives

### 1. *Mother*

On February 26, 2025, DCFS called Mother to ask about Native American ancestry and left a voice message requesting a call back. Mother and DCFS then texted about whether Mother had any ICWA-related information and if she could provide contact information for other family members who could provide information about any Native American ancestry. Mother did not respond to this inquiry. DCFS accordingly called Mother again and asked for a return call. None was received.

On March 3, 11, and 31, 2025, DCFS called Mother and left voice messages asking for a return call to obtain information about Native American ancestry. Mother did not respond.

On April 10, 2025, DCFS was unsuccessful in reaching Mother by telephone. On April 24, 2025, DCFS called mother and left a voice message asking for a return call. When Mother called back, DCFS asked her if she had any information as to her children having Native American ancestry and if there were any family members who could provide such information. Mother responded, " 'I don't have any information right now.' " On April 28, 2025, DCFS called Mother and left a voice message asking for a return call to follow up on any Native American ancestry information. Mother did not respond.

On May 1, 2025, DCFS texted Mother asking for her current address and any information about Native American ancestry. Mother responded by providing only her address. On May 12, 2025, DCFS left Mother a voicemail requesting

information about Native American ancestry; Mother did not respond.

On May 13, 2025, DCFS reached Mother by telephone. Mother claimed that her grandmother, maternal great-grandmother (MGGM), " 'was Comanche,' " that Mother was a registered Comanche tribal member but did not " 'know where the tribe was at,' " the children were not registered, and Mother did not know if MGGM was registered. Mother claimed to have proof of her tribal registration. DCFS requested Mother provide that proof. Mother never did.

At a court hearing on May 27, 2025, the juvenile court told Mother that it would not further consider reunification of the children with her and that the only remaining issue before the court was ICWA compliance. Mother thereafter failed to appear at all subsequent juvenile court hearings.

On June 5 and 12, and on July 2, 2025, DCFS called Mother and left a voice message asking for a return call to obtain information about Native American ancestry. Mother did not respond.

2. *Maternal Uncle Ruben D. and Aunt Jessica R. (Prospective Adoptive Parents)*

On March 3, 2025, DCFS spoke to maternal uncle and the prospective adoptive father of X.A. and E.A., Ruben D., about whether the children had Native American ancestry. Ruben responded that he had been told MGGM had some Native American ancestry, but he did not communicate with her and did not know her whereabouts. Ruben disclaimed any knowledge that MGM, he, or his siblings had any Native American ancestry.

DCFS also spoke to Ruben D.'s wife (and prospective adoptive mother) Jessica R. on multiple occasions. Each time,

5

she disclaimed knowledge of the children having Native American ancestry or receiving such information from others.

3. *Maternal Uncles Mario M. and Jose M.; Maternal Aunt Isela M.*

On March 10, 2025, maternal uncle Mario M. told DCFS that MGGM had said her family was either Cherokee or Apache. Mario M. stated neither MGM nor his siblings were registered with any Native American tribe.

That same day, DCFS called maternal aunt Isela M. who responded via text message. Isela recalled MGGM " 'saying we had Native American heritage.' " Isela stated she did not have MGGM's contact information and directed DCFS to another relative who might have it.

On April 24, 2025, maternal uncle Jose M. told DCFS that MGGM was from Texas and had Apache ancestry, and that he did not know of anyone else who would have additional information on that topic.

4. *MGM*

On July 16, 2024, DCFS called MGM to ask if she had any knowledge as to the children having Native American ancestry. MGM did not answer the telephone.

On February 26, 2025, DCFS reached MGM by telephone. MGM told the DCFS representative, " 'Don't call or text me again, I don't have any information, it's your fault I am not seeing my grandchildren' " before ending the call.

On May 27, 2025, MGM attended a juvenile court hearing. In response to court questioning, MGM acknowledged that she refused to speak to DCFS during the February 26, 2025 telephone call. When the court asked about potential Native American ancestry, MGM said, "From what I know, yes, we do on

6

both my maternal and paternal grandparents." MGM said both her grandparents were born in New Mexico and she was trying to get information from her mother (MGGM) "which is difficult." Mother said the tribes involved were "Comanche and Apache." The court ordered MGM to cooperate with DCFS when they asked for more information.

On June 4 and 5, 2025, DCFS called MGM and left a voice message asking to discuss Native American ancestry. MGM did not respond.

On June 9, 2025, MGM texted DCFS that she would "be working on getting both my grand mother[']s [*sic*] birth certificates asap as they were both apparently of American Indian descent. So it appears anyhow[.] After gathering there [*sic*] birth certificates from the [I]ndian census or from where they were born we will then contact the Indian bureau to move further but apparently our counselors [s]ay it may take months. Comanche will allow up to [eight] generation[s] to register. That's all the information I have for now[.] And it's all questionable. If they as to face American Indian Oops [*sic*] this is my mother[']s birth certificate." The record contains no indication MGM attached a birth certificate to the message.

On June 11, 2025, DCFS contacted MGM to discuss her text message but received no response.

On July 10, 2025, DCFS spoke with MGM. MGM stated "I don't have any more information, it[']s not going further. I have not obtained the birth certificates. The fact that my mother's family was [N]ative American but they are all dead. I am not registered, neither is my sister nor [mother]. My mother, [MGGM], was Spanish and Indian. My mom's mom was Maria R[.] married Manuel F[.]; she lived in New Mexico. My father's

7

mother, Manuela D[.], lived in El Paso, Texas. At this point, it has been emotional trying to help my daughter with this issue. The children are in a good home with Jessica and Ruben and why fight it anymore."

5. *Maternal Great-aunt Nelly O.*

On May 14, 2025, DCFS contacted maternal great-aunt Nelly O. to inquire about Native American ancestry. DCFS shared with Nelly that Mother had reported MGGM was from the Comanche tribe. Nelly laughed when informed of Mother's statement, and said, "no, I think she was Aztec, I don't know." Nelly denied having any information that MGGM had a Native American background.

On June 5, 2025, DCFS spoke again with Nelly. She said that the generation of relatives that preceded MGGM had all passed away.

On July 10, 2025, Nelly told DCFS that she had not received any additional information concerning family ancestry beyond what she had already provided.

6. *Maternal Grandfather (MGF) Joe M.*

On May 12, 2025, DCFS phoned MGF and left a voice message inquiring about Native American ancestry. MGF did not respond.

7. *MGGM*

On February 26, 2025, DCFS reached MGGM by telephone. The DCFS employee identified herself, the reason for her call, and asked if they could meet to gather information on any possible Native American ancestry. MGGM responded by refusing to share any information about her family background and refusing to meet with DCFS.

On April 24 and again on May 9, 2025, DCFS telephoned MGGM and left a voice message inquiring about her knowledge of potential Native American ancestry. MGGM did not respond.

8. *Letters to Indian Officials*

In a May 27, 2025 interim review report, DCFS informed the court that it had sent ICWA notices by certified mail to the following tribes: (1) Fort Still Apache Tribe, (2) Mescalero Apache Tribe; (3) Apache Tribe of Oklahoma, (4) Jicarilla Apache Nation, (5) San Carlos Apache Tribe, (6) Tonto Apache Tribe, (7) Yavapai-Apache Nation, (8) White Mountain Apache Tribe, (9) Cherokee Nation, (10) United Keetoowah Band of Cherokee Indians in Oklahoma, (11) Eastern Band of Cherokee Indians, and (12) Comanche Nation of Oklahoma. DCFS also sent notice to the Bureau of Indian Affairs.

On July 11, 2025, DCFS informed the court it had received the following responses (which it attached for the court's review). The Fort Still Apache, Mescalero Apache, and Tonto Apache Tribes all stated that the children were not eligible for tribal membership. The White Mountain Apache Tribe stated that neither the children nor their parents were enrolled in the tribe. The Yavapai-Apache Nation reported that the children were not enrolled nor eligible for enrollment. The Comanche and Cherokee Nations responded that the children were not eligible for membership and that they did not intend to intervene in the case.

DCFS later followed up with the tribes that had not yet replied (in some cases multiple times). The Apache Tribe of Oklahoma eventually responded that the children were not eligible for enrollment. A representative of the Jicarilla Apache Nation said the children and their parents were not eligible for

9

enrollment; the representative promised to send a confirming email but none was received. The remaining tribes continued to be nonresponsive.

## C. The Juvenile Court Makes ICWA Findings and Reinstates the Termination of Parental Rights

At a December 1, 2025 hearing, counsel for DCFS argued the agency had made exhaustive efforts to comply with its ICWA-related duties. Counsel for Mother was present (as noted previously, Mother was not) and did not raise any concern that the post-remand ICWA inquiry was somehow deficient. The juvenile court found no reason to believe that X.A. or E.A. were Indian children and reinstated the previous order terminating Mother's parental rights.

## DISCUSSION

## A. Forfeiture

DCFS initially contends that Mother forfeited her claims of ICWA error by failing to identify for the juvenile court any of the errors she now claims. DCFS acknowledges "[t]he generally accepted rule . . . that the forfeiture doctrine does not bar consideration of ICWA notice issues on appeal" (*In re Alice M.* (2008) 161 Cal.App.4th 1189, 1195), but contends a different rule should apply in a second appeal following a prior ICWA-related appeal and remand for ICWA compliance. Some cases have endorsed such a forfeiture rule in second/subsequent appeals. (E.g., *In re Z.W.* (2011) 194 Cal.App.4th 54, 63-67; *In re N.M.* (2008) 161 Cal.App.4th 253, 269; *In re Amber F.* (2007) 150 Cal.App.4th 1152, 1155-1156; *In re X.V.* (2005) 132 Cal.App.4th 794, 804-805.) At least one court has gone the other way. (*In re Alice M.*, *supra*, at pp. 1195-1197.) We need not reckon with this

10

rift. Regardless of Mother's failure to identify any of the errors she now claims in time for the juvenile court to address them, the juvenile court did not err.

## B. Standard of Review

We review for substantial evidence the juvenile court's factual finding that ICWA and Cal-ICWA do not apply. (§ 224.2, subd. (i)(2).) "[T]he juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1141.) " 'On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes.' " (*In re Kenneth D.* (2024) 16 Cal.5th 1087, 1101-1102.)

## C. Applicable Legal Principles

Congress enacted ICWA " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.' " (*In re Dezi C.*, *supra*, 16 Cal.5th at pp. 1128-1129.) An " 'Indian child' " is "[a]ny unmarried person who is under age 18 years of age and who is either of the following: [¶] (A) A member or citizen of an Indian tribe. [¶] (B) Eligible for membership or citizenship in an Indian tribe and is a biological child of a member or citizen of an Indian tribe." (§ 224.1, subd. (b)(1).)

11

Under Cal-ICWA, the juvenile court and DCFS "have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies by inquiring whether a child is or may be an Indian child." (*In re Dezi C.*, *supra*, 16 Cal.5th at pp. 1131-1132.) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.* (2020) 55 Cal.App.5th 558, 566.)

The initial inquiry includes asking the child's family, including extended family members, whether the child is, or may be, an Indian child.[2] (§ 224.2, subd. (b)(1).) Extended family members include adults who are the child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (§ 224.1, subd. (c)(1).)

"Our Supreme Court has acknowledged that this duty of initial inquiry does not require interviewing 'every' extended family member; rather, where the juvenile court's finding that [DCFS] conducted an adequate inquiry and that ICWA does not apply is 'supported by sufficient evidence,' conditional reversal is not required 'even if the agency did not inquire of everyone who has an interest in the child.'" (*In re Bella L.* (2026) 117 Cal.App.5th 1284, 1290, citing *In re Dezi C.*, *supra*, 16 Cal.5th at pp. 1140-1141.)

---

[2] Effective September 27, 2024, the Legislature amended section 224.2 to require DCFS to conduct its initial inquiry of extended family members upon its first contact with them. (*Id.*, subd. (b)(1); Stats. 2024, ch. 656, § 3.) The instant matter was pending both before and after this amendment.

The duty of further inquiry arises when the agency has "reason to believe" that an Indian child is involved. (§ 224.2, subd. (e); *In re Dezi C.*, *supra*, 16 Cal.5th at p. 1132.) Reason to believe is statutorily defined as "information suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe." (§ 224.2, subd. (e)(1).) "Further inquiry includes '(1) interviewing the parents and extended family members; (2) contacting the Bureau of Indian Affairs . . . and State Department of Social Services; and (3) contacting tribes the child may be affiliated with and anyone else that might have information regarding the child's membership or eligibility in a tribe.'" (*In re Claudia R.* (2025) 115 Cal.App.5th 76, 85; see § 224.2, subd. (e)(2)(A)-(C).)

## D. The ICWA-related Inquiry Here Was Adequate

Mother claims the ICWA-related inquiry here was deficient because (1) DCFS did not attempt to visit MGGM or other relatives in person after they refused to provide information over the phone, (2) DCFS improperly relied on MGM to make additional investigation of MGGM's potential ancestry, and (3) only one attempt was made to contact MGF.

We reject these claims. DCFS needs to contact those relatives "reasonably available to help the agency with its investigation." (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1140.) It "is not required to 'cast about' for information or pursue unproductive investigative leads." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1053.) The only living relatives it was

13

suggested might have tribal affiliation were MGGM and MGM.[3] MGM equivocated on whether to provide information and indicated in any event that she would need to get it from MGGM. DCFS followed up with MGM multiple times before MGM indicated she would not provide any more information. But DCFS did not rely solely on MGM. DCFS spoke directly to MGGM, and she refused to provide any information and to meet in person. Despite this, DCFS tried two more times to contact MGGM; she failed to respond to that outreach as well. DCFS also contacted other relatives to see if they had credible information about MGGM's ancestry and came up empty.

Nothing indicates that MGM and MGGM were anything other than sincere in refusing to cooperate, and DCFS was not required to stalk them in the vain hope they might change their mind. The same holds true for Mother's other relatives who refused to answer or return phone calls or other outreach from DCFS seeking information. Although DCFS only attempted once to reach MGF, the fact is it did try to reach him, he did not respond, and no one suggested he had Native American ancestry or information about it. Instead, everyone contacted claimed any such ancestry was on MGM's side of the family.

_____

[3] In the period after the parental rights termination order was conditionally reversed and before the court explained to her that ICWA-related issues would not result in further reunification efforts, Mother retreated from her prior denials of any native ancestry and claimed she had written proof of Comanche tribal enrollment. She never provided that information, and the information received from the Comanche tribe indicated Mother's claim was false.

Mother also claims we should reverse because the notices that DCFS sent to the tribes had certain deficiencies, and the ICWA-030 notices themselves were not filed with the juvenile court until after it had determined that ICWA and Cal-ICWA did not apply. We reject these claims as DCFS was not required to send those notices in the first place. Mother's relatives made statements that suggested the possibility the children had Indian ancestry. But "[a] suggestion of Indian ancestry is not sufficient under ICWA or related California law to trigger the notice requirement." (*In re D.F.*, *supra*, 55 Cal.App.5th at p. 571.) Notice is required only "[w]hen there is reason to believe the child *is* an Indian child" (§ 224.2, subd. (e)(2), italics added), meaning "information suggesting that either the parent of the child or the child is a member or citizen, or may be eligible for membership or citizenship, in an Indian tribe" (*id*., subd. (e)(1)). The only information provided to DCFS that met these criteria was Mother's claim that she was an enrolled member of the Comanche tribe, and the juvenile court could reasonably conclude this claim was not credible. For years before Mother made this assertion, Mother consistently denied any Indian ancestry much less tribal membership. In connection with trying to get reunification services reinstated post-remand, Mother claimed to be a Comanche tribal member but failed to provide information demonstrating her enrollment despite multiple requests. Once she learned reunification services would not be reinstated, she disappeared. Mother's full name and birthdate were provided to the Comanche Nation, and it responded she was *not* an enrolled member.

In sum, the juvenile court did not err in finding DCFS undertook reasonable steps upon which the court could determine

15

that X.A. and E.A. are not Indian children. Although "there appears to be little incentive for parents to engage in [ICWA-related gamesmanship] in the first instance" "to delay resolution of a case or a minor's permanency" (*In re Dezi C.*, *supra*, 16 Cal.5th at p. 1149), this case demonstrates that such incentives do exist following a conditional reversal where the only remaining issue is ICWA. After remand for further inquiry, Mother lied that she was an enrolled tribal member. The individuals from whom she claimed Native American ancestry made it difficult to gather information and unnecessarily prolonged the process. Mother said nothing during the proceedings about any alleged inadequacy in the inquiry of her relatives and waited until this appeal to spring her purported concerns, seeking to continue to forestall the reinstatement of the parental rights termination order. All the while, X.A., E.A., and the relatives with whom they have been placed have waited for permanency.

## DISPOSITION

The juvenile court's order terminating Mother's and Father's parental rights to the children X.A. and E.A. is affirmed.

CERTIFIED FOR PUBLICATION


WEINGART, J.


We concur:



ROTHSCHILD, P. J.



BENDIX, J.

17